**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| R.S., *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 8:20-cv-01300-PX |
| JACK R. SMITH, *et al.*, | * | |
| Defendants. | * | |
| | *** | |

## MEMORANDUM OPINION

In this Individuals with Disabilities Education Act ("IDEA") case, the parties dispute whether Defendants, Montgomery County Board of Education and Jack R. Smith, in his official capacity as Superintendent of the Montgomery County Public Schools, (collectively "MCPS") must reimburse the Parent of elementary school student, R.S., ("the Parent") for the unilateral placement of the child in non-public special education schools.  ECF Nos. 18, 24.  The Parent appeals the decision of Maryland Administrative Law Judge Ann C. Kehinde ("ALJ") issued February 20, 2020, which found that MCPS had provided R.S. a free appropriate public education, thus declining to award reimbursement.  Both parties now cross move for summary judgment in their favor.  The matter has been fully briefed, and no hearing is necessary.  *See* Loc. R. 105.6.  For the following reasons, the Parent's motion for summary judgment is denied, ECF No. 18, and MCPS' motion for summary judgment is granted.  ECF No. 24.

**I.      The Individuals with Disabilities Education Act ("IDEA")**

Children with disabilities are entitled to a free appropriate public education, or "FAPE," pursuant to the IDEA.  20 U.S.C. § 1412(a)(1)(A).  A FAPE provides children with disabilities "meaningful access to the educational process" in "the least restrictive environment" that is "reasonably calculated to confer some educational benefit."  *E.S. v. Smith*, No. PWG-17-3031,

2018 WL 3533548, at *2 (D. Md. July 23, 2018) (citing *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014)).  Although "the benefit conferred . . . must amount to more than trivial progress," the IDEA "does not require that a school district provide a disabled child with the best possible education." *M.C.*, 2014 WL 7404576 at *1 (citing *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982); *Reusch v. Fountain*, 872 F. Supp. 1421, 1425 (D. Md. 1994)).  IDEA also strongly disfavors removing a disabled child completely from the general education setting.  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999–1000 (2017).  Whenever possible, "IDEA requires that children with disabilities receive education in the regular classroom" as opposed to exclusively amongst disabled peers.  *Id.* at 1000 (quoting *Rowley*, 48 U.S. at 202); *see also* 20 U.S.C. § 1412(a)(5).

When a school identifies a student with special needs, it must prepare and implement an individualized educational plan ("IEP") that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 137 S. Ct. at 999 ("Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal.") (emphasis in original).  That is, an IEP must be crafted such that the child may "achieve passing marks and advance from grade to grade."  *Id.* (quoting *Rowley*, 458 U.S. at 203–04) (internal quotation marks omitted).  The IEP must address the student's current educational status, annual educational goals, the need for special educational services or other aids necessary to help meet those goals, and whether the child may be educated in an inclusive school classroom with non-disabled students.  *See M.C.*, 2014 WL 7404576, at *1 (citing 20 U.S.C. § 1414(d)(1)(A)); *see also J.R. v. Smith*, No. DKC-16-1633, 2017 WL 3592453, at *1 (D. Md. Aug. 21, 2017).

Parents play a critical role in the IEP process.  They are granted the opportunity to participate in not only the creation of the IEP but are invited to all meetings convened to modify the IEP.  *See* 20 U.S.C. § 1414(d)(1)(B); *see also MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 527 (4th Cir. 2002).  The parents are integral members of the IEP team.

Once an IEP is finalized, a parent may accept or reject it.  If a parent rejects the IEP as failing to provide a FAPE, she may pursue administrative remedies before an ALJ at a Due Process hearing.  In the interim, a parent may pay for additional services, to include placement in a private school, and seek reimbursement as a remedy.  *E.S.*, 2018 WL 3533548, at *2 (quoting 20 U.S.C. § 1412(a)(1)(C)(iii) and *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985)).  Either party may challenge the outcome of the Due Process hearing by filing suit in a district court of the United States or the appropriate state court.  20 U.S.C. § 1415(i)(2).

Against the backdrop of this remedial scheme, the Court turns to this case.

## II.     Factual Background [1]

As a toddler, R.S. had been diagnosed with speech and language delay.  P. Ex. 24 at 3.  In the fall of 2015, R.S. began her kindergarten year at Fields Roads Elementary School ("Fields Road") which is part of MCPS.  MSPS Ex. 1.  In advance of the school year, an IEP team convened in June 2015.  The IEP team specifically identified R.S.' disability as developmental delay and recommended that R.S. receive eight hours of in-class special education, two hours of out-of-class services for early intervention in reading, one hour of speech/language therapy, a thirty-minute session of physical therapy and another of occupational therapy per week, and transportation services to address the Parent's concerns that R.S.' motor skills prevented her

---

[1]  Factual citations are to the underlying administrative record and are also generally consistent with the ALJ's findings of fact.  Citations to the record conform to the following format: the Parent's exhibits appear as "P. Ex. __"; MCPS' exhibits as "MCPS Ex. __"; the transcript as "Tr. __"; and the ALJ Decision as "ALJ Op. __."

from safely riding the school bus.  MCPS Ex. 1 at 31, 42.  The IEP also provided R.S. with

additional assistance such as teacher monitoring and comprehension checks, dividing

assignments into easily comprehensible subparts, additional breaks and physical movement

opportunities, and sensory activities to improve focus and attention.  *Id.* at 11–21.  For

supplementary aids, MCPS also allowed R.S. to use pencil grippers, highlighters, a slant board

for drawing and writing, visual cues, organizers for math and reading, extended time, and the

ability to take frequent breaks.  *Id.*  The Parent agreed with the team recommendations and the

IEP was put in place.  *Id.* at 36–44.

In kindergarten, R.S. especially struggled with attention and focus, and experienced

delays in the areas of math, reading, communication, fine motor development, and gross motor

development.  MCPS Ex. 1 at 5–9.  In the beginning of her kindergarten year, R.S. performed

below age-level in reading and language, and just barely at age-level in math.  *Id.*  Although

generally described as a happy and friendly child, R.S. also struggled with socializing with peers

outside the classroom.  Tr. at p. 1028; P. Ex. 1A at 1–5; *see also* MCPS Ex. 2 at 13.  In response,

classroom teacher, Melanie Moore, allowed R.S. to pick one or two peers with whom to have

indoor recess so to foster healthy peer relationships in a more comfortable environment.  Tr. at p.

1031–33.

In the latter half of kindergarten, R.S. demonstrated satisfactory knowledge of basic math

facts, concepts, and application; strong oral comprehension of text read aloud, and strong

vocabulary skills.  MCPS Ex. 2 at 9–11.  R.S. also appropriately participated in classroom

discussions and made meaningful contributions.  Tr. at p. 1032; MCPS Ex. 2 at 11.  She

performed at grade-level in math, writing, and reading, in which she achieved a level consistent

with exceeding expectations.  *See* MCPS Ex. 2 at 9–10, 17.  By the end of the year, R.S. was

proficient in nearly all topics, save art and one physical education movement skill.  P. Ex. 5 at 1.

In March 2016, the IEP team met for R.S.' annual review and in preparation for first grade.  MCPS Ex. 2.  From that meeting, the IEP was revised to provide her seven and a half hours of in-class special education, two hours of out-of-class education for reading intervention, one hour of speech/language therapy, one thirty-minute session of occupational therapy and another of physical therapy.  MCPS Ex. 2 at 37.  Her supplemental aids and accommodations remained largely unchanged.  *Id.*  The Parent agreed to the IEP as modified.  MCPS Ex. 2 at 40–41, 46–48.

In the beginning of first grade, R.S. found it difficult to navigate the school building; she also struggled with organization, attention, and socialization with peers.  MCPS Exs. 3 at 9; 32 at 3.  She was slightly below grade-level in reading and writing, although she was on grade-level in math with accommodations.  MCPS Exs. 3 at 9; 32.  R.S. also experienced some distress about going to school and was described as having emotional breakdowns on occasions.  Tr. at p. 601–03.

Accordingly, in December 2016, MCPS convened an IEP meeting to discuss the need for formal assessments to better identify R.S.' educational and social needs.  *See* MCPS Exs. 3 at 10; 4 at 10; Tr. at 798.  The IEP team (including the Parent) agreed that R.S. should undergo educational, psychological, and speech-language assessments.  MCPS Ex. 3 at 5–9.  These assessments included a records review, formal testing, and classroom observation, and were conducted by Jessica Bikle, R.S.' special education teacher; Kylen Whitmore, a speech language pathologist; and Patricia Parker, an MCPS school psychologist.  *See* MCPS Exs. 4–6, 11; Tr. at p. 799–810.

The results of the educational assessment detailed R.S.' struggles with short attention

span, hyperactivity, remaining in her seat, and keeping her glasses on.  However, the assessment also noted R.S.' strengths in certain reading and math skills.  *See* MCPS Ex. 5.  The speech assessment indicated that R.S. had struggled with articulation, intelligibility, and grammar, but reflected strengths in receptive vocabulary, paragraph comprehension, and recognizing synonyms.  MCPS Ex. 6.  The psychological evaluation determined that R.S. met the diagnostic criteria for attention deficit hyperactivity disorder ("ADHD") and showed signs of Autism Spectrum Disorder.  MCPS Ex. 4 at 10–11.

Based on these evaluations, the IEP team met again in March 2017 and revised the IEP. With the Parent's agreement, the team changed R.S.' primary disability to "Other Health Impairment."  The IEP also detailed R.S.' delays in fine and gross motor skills, writing, organization, attention, social skills, and language.  MCPS Ex. 7 at 13.  As for accommodations, The IEP incorporated new supports and instructional strategies suggested by Bikle and Parker. *Compare* MCPS Exs. 1, 2 *with* MCPS Ex. 7.  The IEP also increased in-class special education services to eight hours.  For the two hours of out-of-class small group reading intervention time, R.S. would work on her social skills and attention difficulties in a small group setting.  MCPS Ex. 7 at 57; *see also id.* at 21.  Because R.S. was reading at grade-level and had met her reading goal, the IEP did not identify specific additional reading objectives.  *Id.* at 21. The Parent agreed with the changes, adding that R.S. was "generally doing well;" however the Parent noted that she wished R.S. could enjoy better peer relationships.  *Id.* at 23, 28.  The IEP changes were implemented immediately.

In March and April of 2017, R.S. missed fourteen days of instruction for a family trip and a visit to a private school.  She was also out of school six additional days for spring break.  *See* MCPS Ex. 29 at 3.  Predictably, R.S.' academics suffered upon her return as she struggled to

reacclimate to the school environment.  MCPS Ex. 9.  R.S.' teachers reported that by May, her

reading and language skills had fallen below grade level, but her math skills remained on grade-

level and above testing benchmarks.  MCPS Exs. 9 at 11–13; 32 at 16–18.

In June 2017, the IEP team met again in preparation for R.S.' second grade year.  MCPS

Ex. 9.  The team concluded, and the Parent agreed, that R.S would continue to receive eight

hours of in-class special education services, two hours of out-of-class reading intervention and

social development, and physical, occupational, and speech/language therapy.  Her

supplementary accommodations and learning aids were mostly unchanged.  *Id.* at 5, 44–52.  The

IEP team added a weekly session of counseling and goals for reading, occupational therapy,

behavior/task completion, written language, attention, speech, organization, gross motor skills,

and social skills.  *Id.* at 34–43, 52.

R.S. did not attend Fields Road for second grade.  MCPS Ex. 10 at 24–25.  Rather, the

Parent unilaterally placed R.S at Echelon Academy ("Echelon").  MCPS Ex. 26; P. Ex. 1 at 6–7.

Unlike Fields Road, Echelon takes a project-based approach to learning where instruction stems

from topics of interest to the student.  P. Ex. 37 at 8–9; Tr. at p. 189–190.  Echelon also did not

offer R.S. any speech and language services.  However, MCPS continued to provide weekly

speech and language therapy for R.S.  *See* MCPS Ex. 10 at 23, 25, 27.  Ultimately, the Parent did

not bring R.S. to speech and language therapy sessions, citing scheduling difficulties.  *See id.*;

Tr. at p. 465–66.

Towards the end of R.S.' second-grade year at Echelon, and in preparation for the annual

IEP meeting, the Parent secured a private psychologist to evaluate R.S.  *Cf.*  P. Ex. 24.  Dr.

Aparna Rao administered a battery of tests and interviewed R.S. and her Parent, all in Dr. Rao's

office.  Dr. Rao also reviewed R.S.' previous test scores and a sample of her schoolwork but did

not visit either Echelon or Fields Road.  *Id.* at 2, 5; 9/10 Tr. 326–39.  Dr. Rao concluded that R.S.

met the criteria for Autism Spectrum Disorder, and generalized anxiety disorder.  Dr. Rao

therefore concluded that R.S. was best suited for specialized instruction in the small-class

educational environment as offered at Echelon.  P. Ex. 24 at 28–35.

      Fields Road special education teacher, Heidi Berkowitz, evaluated R.S. as well.  P. Ex.

28.  Unlike Rao, Berkowitz observed R.S. at Echelon.  Berkowitz noted that in class, R.S. had to

be consistently reminded to stay on task and was frequently distracted.  *Id.*  R.S. did appear to

comprehend content that had been read to her.  Berkowitz also noticed that R.S., who is severely

nearsighted, was not wearing her glasses that day because she had lost them some time ago.  *Id.*

at 2; Tr. at p. 447.

      On July 26, 2018, with the benefit of both reports, the IEP team met.  *See* MCPS Ex. 17.

The IEP team changed R.S.' disability to "Multiple Disabilities," to include a learning disability,

other health impairment (ADHD), and Autism Spectrum Disorder.  *Id.* at 1.  The IEP also

proposed for R.S.' third grade year that she return to Fields Road and receive eleven hours and

fifteen-minutes of in-class special education, four hours of out-of-class instruction for reading

and math, one-hour of speech/language therapy, thirty-minutes each of occupational and physical

therapy, and fifteen-minutes of counseling services weekly.  *Id.* at 42–43.  The IEP also

recommended an array of supplemental aids, including use of a word processor and calculator.

*Id.* at 15–28.

      Critically, the IEP team concluded that R.S. had not made grade-level progress

academically or socially at Echelon.  *See* MCPS Ex. 17 at 5–12.  She did not make progress

toward reading, *id.* at 5–6 (noting R.S.' reading accuracy was at an early first-grade-level); and

she had fallen well below expected levels for her age in math and writing, *id.* at 7–8.  Her oral

communication was also noted as an area of concern.  *Id.* at 9.  Socially she fared no better.

Reportedly, R.S. played alone at recess and did not interact with peers in class.  *Id.* at 10.

R.S.' behavior at Echelon grew concerning as well.  Evidently, R.S. would speak in a

growling voice and would refer to herself as "the Hulk," saying things like "I hate you," and "I

want to kill you."  P. Ex. 24 at 4–5.  R.S., however, reported that she was happy at Echelon and

the Parent indicated that she believed R.S.' anxiety about school had diminished.  P. Exs. 29 at 1;

30; Tr. at p. 475.

In the fall of 2018, R.S. returned to Echelon for third grade and the Parent sought

reimbursement for the placement.  *See* MCPS Ex. 16-1; P. Exs 1; 52.  Again, Echelon did not

provide R.S. any speech and language therapy, and MCPS terminated the services because R.S.

had not attended her appointments.  Also in the fall, the Parent retained Amy Mounce, a private

education consultant, to assess R.S. at Echelon by way of classroom observations, teacher

interviews, and records review.  P. Ex. 37 at 3–4, 13.  According to Mounce, R.S. appeared

frequently off task during instruction at Echelon, and required redirection to help her complete

tasks.  *Id.* at 9–10.  However, after also visiting Fields Road, Mounce concluded that the general

education setting was ill-suited for R.S.' constellation of needs.  *Id.* at 37 at 1.

In February 2019, MCPS psychologist, Patricia Parker, along with MCPS special

educator Brenda Aswell, formally observed R.S. at Echelon.  MCPS Exs. 23–24.  Parker

observed that students in the classroom rarely interacted with one another.  MCPS Ex. 24 at 2.

Parker also observed that R.S. appeared to have difficulty seeing, a likely adverse impact on her

educational performance.  *Id.*; *see also* Tr. at p. 804.  Aswall also described the Echelon reading

curriculum as self-directed and administered through an iPad reading program.  MCPS Ex. 23;

*see also* Tr. at p. 186–88.  R.S. appeared to struggle with this approach, and the classroom

teacher neither corrected R.S.' reading errors or checked in with R.S. to determine if the child comprehended the material.  MCPS Ex. 23 at 1.

By spring of 2019, R.S.' third-grade year, R.S.' reading skills had regressed.  She was performing between a first and second grade reading level.  P. Ex. 49 at 1.  Socially, she stagnated in that she primarily played by herself at recess and colored rather than interacting with peers.  MCPS Ex. 46.  Progress reports for R.S. reflect that R.S. repeated many of the social, language, and math skills first presented in second grade; and that she struggled with self-control; oral reading, using context to confirm or self-correct when reading, fluency in addition and subtraction using various operations.  *Compare* P. Ex. 29 *with* P. Ex. 52.

The March 2019 IEP incorporated the findings of Parker, Aswell, and Mounce.  Tr. at p. 71; MCPS Ex. 23, 24, 45 at 1.  For fourth grade, the IEP proposed that R.S. receive eleven hours and fifteen-minutes of in-class special education services, four hours per week of out-of-class services for reading and math intervention, one thirty-minute session of occupational therapy, another of physical therapy, two sessions of speech/language therapy, and fifteen-minutes of counseling services.  MCPS Ex. 46.  The IEP again recommended that R.S. attend Fields Road. *Id.* at 1.

On July 2019, the IEP team met again to incorporate additional information regarding R.S.' third and fourth quarter performance at Echelon.  MCPS Ex. 53. [2]  While many of the recommendations remained unchanged, the IEP team increased in-class special education service hours to sixteen per week to account for R.S.' sharp drop in performance in the latter half of the year.  MCPS Ex. 52 at 45.  The Parent rejected the IEP and instead unilaterally enrolled R.S. at

---

[2] In April 2019, Mounce also informally assessed R.S.' reading skills and concluded that R.S.' ability to read sight words was inconsistent and that she was unable to read lists.  P. Ex. 48.

the Katherine Thomas School (KTS), a non-public day school for children with disabilities. *See* MCPS Ex. 45 at 2; P. Ex. 1 at 14.

In April 2019, the Parent filed a Due Process Complaint with the Maryland Office of Administrative Hearings, seeking reimbursement for R.S.' placement at Echelon for the 2017–18 and 2018–19 school years. In July 2019, the Parent amended her Complaint to add reimbursement for R.S.' placement at KTS for the 2019-20 school year. P. Ex. 1. MCPS opposed, arguing that its proposed placements at Field Roads provided R.S. a FAPE.

On September 10, 2019, Administrative Law Judge ("ALJ") Ann C. Kehinde commenced a Due Process hearing. At a Due Process hearing, the party challenging the student's placement bears the burden of proving by a preponderance of the evidence its respective position as to provision of a FAPE. Both parties are permitted to call witnesses and introduce evidence. Ultimately, the ALJ prepares a written decision setting out findings of fact and conclusions of law. 34 C.F.R. § 300.512(a)(5); Md. Code Ann., Educ. § 8-413(h).

Although the Due Process hearing began in September, illnesses caused significant delays. First the Parent's counsel suddenly became sick, necessitating a brief continuance. Then the ALJ had to take extended medical leave. An interim ALJ offered to transfer the matter to a new ALJ, but the parties agreed to resume the hearing when ALJ Kehinde returned from leave.

At a status conference in December 2019, the Parent sought to reopen her case-in-chief to supplement the record with new evidence of R.S.' performance at KTS for the fall of 2019. The ALJ denied the request. When the hearing resumed on January 21, 2020, the Parent sought reconsideration of the ALJ's denial to supplement the record. The ALJ again denied the request, explaining that for purposes of finality, the ALJ refused to reopen the record, lest the case become a "moving target." ALJ Op. at 4–5; *see also* Tr. at p. 1061–1106.

All told, the hearing took place over ten days, during which nine witnesses testified and 118 exhibits were admitted into the record.  On February 20, 2020, the ALJ issued a 67-page written decision finding in favor of MCPS.

In the decision, the ALJ explained the Parent bore the burden of proving first that MCPS failed to provide R.S. a FAPE.  If the Parent satisfied this burden, she next had to demonstrate that the Parent's private school placement was appropriate and finally whether equitable considerations favor reimbursement.  ALJ Op. at 41, 64 (citing *Sch.  Comm of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985)).  After thoroughly reviewing the evidentiary record, the ALJ determined that MCPS provided R.S. a FAPE for the challenged years, thus obviating the need to decide whether Echelon or KTS were suitable placements.  *Id.* at 61–64.  The ALJ, therefore, denied the Parent's requested relief.

Pursuant to the IDEA, the Parent appealed the ALJ's decision to this Court on May 26, 2021.  ECF No. 1.  Here, the Parent essentially maintains that the ALJ wrongly decided that MCPS provided R.S. a FAPE.  MCPS, for its part, contends that the ALJ's decision got it right.  For the following reasons, the Court agrees with MCPS.  ECF Nos. 18, 24.

## III.    Standard of Review

This Court conducts a "modified de novo review," of the ALJ's determination, giving "due weight to the underlying administrative proceedings."  *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir. 2002); *see also T.B., Jr. ex rel. T.B., Sr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 572 (4th Cir. 2018); *Wagner v. Bd. of Educ. of Montgomery Cnty.*, 340 F. Supp. 2d 603, 611 (D. Md. 2004).  Findings of fact "made in a regular manner and [with] evidentiary support," are presumed correct.  *Wagner*, 340 F. Supp. 2d at 611 (quoting *Cavanagh v. Grasmick*, 75 F. Supp. 2d 446, 457 (D. Md. 1999)).  Where a

reviewing court does not adhere to such factual findings, the court must explain its reasons for crediting facts different than those on which the ALJ relied.  *MM*, 303 F.3d at 531 (citing *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991)).

Having accorded the ALJ's findings of fact proper deference, the Court is then "free to decide the case on the preponderance of the evidence."  *Doyle*, 953 F.2d at 105.  The Court may, for example, "believe[ ] that the evidence considered as a whole point[s] to a different legal conclusion."  *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011).  In making its determination, however, this Court must not substitute her "own notions of sound educational policy for those of the school authorities."  *Hartmann ex rel. Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir. 1997) (quoting *Rowley*, 458 U.S. at 206).  Pure questions of law are reviewed de novo.  *See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 514 (4th Cir. 2014).  The moving party bears the burden of demonstrating the propriety of the relief sought.  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

On a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party to determine whether any disputed issue of material fact precludes entering judgment in the movant's favor as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)).  "Where, as here, cross motions for summary judgment are filed, a court must 'evaluate each party's motion on its

own merits, taking care [in each instance] to draw all reasonable inferences against the party whose motion is under consideration.'" *Snyder ex rel. Snyder v. Montgomery Cnty. Pub. Sch.*, No. DKC-2008-1757, 2009 WL 3246579, at *5 (D. Md. Sept. 29, 2009) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

## IV.    Analysis

The Parent first lodges several procedural challenges to the ALJ's factual determinations, arguing that the ALJ impermissibly declined to augment the record evidence, engaged in "irregular" factfinding, and improperly credited MCPS' expert witnesses over the Parent's experts. The Parent also contends that the ALJ erred in deciding that MCPS provided R.S. a FAPE. The Court addresses each of the Parent's arguments in turn.

### A.    ALJ's Refusal to Consider Additional Evidence

The Parent argues that the ALJ erred in declining to reopen her case-in-chief to admit additional evidence concerning R.S.' performance and evaluations at KTS for fourth grade. ECF Nos. 18-1 at 25–29; 19. The Parent maintains that the new evidence supports an inference that R.S. requires the kind of intensive educational program available through unilateral placement outside the MCPS system. ECF No. 19-1 at 6. As relief, the Parent asks this Court to consider the excluded evidence, as well as additional evidence obtained after the Due Process hearing, in support of her arguments. P. Ex. 57–70; ECF No. 19. For the following reasons, the Court will not disturb the ALJ's decision.

The ALJ correctly concluded that, overall, the new evidence was of little relevance to whether MCPS had provided R.S. a FAPE. Although the ALJ acknowledged that the new evidence would provide some insight as to whether the 2019-2020 IEP provided a FAPE, the ALJ also rightly concluded that to allow reopening of the record would create an evidentiary

"moving target."  ALJ Op. p. 5.  As the ALJ recognized, the Parent's challenge centered on whether the IEP's recommended placement at Fields Road with accommodations *as of* the September 2019 hearing provided R.S. a FAPE.  The Parent well knew when the hearing began in September 2019 that the ALJ was called to decide whether MCPS provided R.S. a FAPE. Most relevant to that consideration was the information known about R.S. at the time the IEPs were created.  *See M.L. v. Smith*, No. PX-16-3236, 2018 WL 3756722, at \*7 (D. Md. Aug. 7, 2018) (citing *M.M. ex rel. J.M. v. Foose*, 165 F. Supp. 3d 365, 380 (D. Md. 2015) (hereinafter "*Foose*"); *J.R. v. Smith*, No. DKC-16-1633, 2017 WL 3592453, at \*7–8 (D. Md. Aug. 21, 2017)) (emphasis in original).   Accordingly, the Court finds no error in the ALJ's determination not to reopen the record.

The Parent now argues that IDEA requires that this Court consider the proffered evidence, commanding that "the Court shall hear additional evidence at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii).  But the Fourth Circuit has interpreted this statutory provision narrowly.  *See Springer v. Fairfax Cnty. Sch. Bd.*, 134 F.3d 659, 666–67 (4th Cir. 1998).  Where admitting new evidence would prolong litigation and postpone finality without any real evidentiary benefit, the Fourth Circuit strongly disfavors expansion of the evidentiary record. *Id.*; *Schaffer ex rel. Shaffer v. Weast*, 554 F.3d 470, 476 (4th Cir. 2009).

The Court declines the Parent's request for the same reasons that the ALJ declined to reopen the Parent's case-in-chief.  Additionally, the Court notes that the ALJ had allowed the Parent to introduce the KTS educational plan for R.S. for the 2019-2020 year and heard from the KTS Director of Lower and Middle School Programs, Nicole Abera, as to the suitability of the KTS program for R.S.  *See, e.g.*, *M.C.E. ex rel. T.Q.A. v. Bd. of Educ. of Frederick Cnty.*, No. RDB-09-3365, 2010 WL 2483440, at \*2–3 (D. Md. June 15, 2010).  Accordingly, to the extent

15

the proffered evidence is marginally relevant, it is cumulative.  Thus, this evidence will not be considered.[3]

## B.      Challenge to ALJ's Factual Determinations

The Parent next contends that this Court should not accord the ALJ's findings of fact any deference because they were not "thoroughly and carefully made."  ECF No. 18-1 at 19–21 (citing *M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189 (9th Cir. 2017)).  The Parent principally relies on *M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189 (9th Cir. 2017) to stand for the proposition that this Court may cast aside IDEA's due deference standard when the ALJ's determination is "not entirely satisfying." *Id.*  In *M.C.*, however, the ALJ wholly ignored certain evidence in the record and did not address all issues presented by the parties.  *Id.* at 1194–95.  The Ninth Circuit, without analysis, simply recognized that the ALJ's deficient performance was entitled no deference. This Court cannot say the same here.

As the Fourth Circuit has made clear, deference must be accorded to the ALJ's findings when they are "regularly made."  *See, e.g.*, *SE.H. v. Bd. of Educ. of Anne Arundel Cnty. Pub. Sch.*, 647 F. App'x 242, 248 (4th Cir. 2016); *Cnty. Sch. Bd. of Henrico Cnty., Va. v. Z.P.*, 399 F.3d 298, 305 (4th Cir. 2005) ("[F]actual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were regularly made.") (internal quotation marks omitted).  This is so even where the facts are "poorly

---

[3] Even if the Court considered the supplemental evidence, it would not change the outcome.  As discussed below, the Court finds that ALJ did not err in determining that MCPS provided R.S. a FAPE up to and at the time the Parent unilaterally removed her from Fields Road and that MCPS would have continued to do so during the challenged years.  Thus, this Court need not reach whether the placement at Echelon or KTS were appropriate.  But even so, the supplemental evidence principally reflects that R.S.' performance now at her second private placement, KTS, was less than stellar.  ECF No. 19-5.  And R.S.' needs as described in the draft IEPs dated December 2019 and June 2020—after she had been out of the MCPS system for nearly two years—provide little additional insight on whether MCPS provided R.S. a FAPE.  *See infra* section IV.D.

explained," provided that ALJ has engaged in standard fact-finding methodology.  *S.T. ex rel. S.J.P.T. v. Howard Cnty. Pub. Sch. Sys.*, No. JFM-14-00701, 2015 WL 72233, at *2 (D. Md. Jan. 5, 2015), *aff'd*, 627 F. App'x 255 (4th Cir. 2016).

A thorough review of the record and ALJ decision reveals no irregularity in the ALJ's factual determinations.  The ALJ considered all documentary evidence and carefully scrutinized both fact and witness testimony.  The ALJ also took great pains to explain her credibility determinations.  ALJ Op. at 42–52.  And the ALJ further explained why she found MCPS' educator assessments, on balance, more persuasive than the Parent's.  *Id.*  Mere disagreement with the ALJ's determinations does not render the facts "irregularly made."  Because this Court discerns no "irregularities" in the ALJ's fact-finding process, the Court will accord the ALJ's factual findings proper deference.

## C.     Credibility Determinations

As a corollary argument, the Parent challenges the ALJ's credibility determinations as unsupported by the record, thus compelling reversal.  Again, the Court must disagree.  When making credibility assessments, an ALJ need not "offer a detailed explanation of his or her credibility assessments," *S.A. v. Weast*, 898 F. Supp. 2d 869, 877–78 (D. Md. 2012).  Rather, all that IDEA requires is the ALJ to resolve factual disputes "in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case."  *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va*, 516 F.3d 254, 259 (4th Cir. 2008); *see also Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 104 (4th Cir. 1991) (A reviewing court should generally not "reverse a trier of fact, who had the advantage of hearing the testimony, on the question of credibility") (internal citation omitted).  Where the ALJ, as fact finder, weighs the witness testimony against other indicia of credibility, and credits or rejects testimony

17

accordingly, the findings will not be disturbed.  *See A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 327–28 (4th Cir. 2004).

Here, the ALJ credited the testimony of R.S.' teachers and special educators at MCPS in concluding that MCPS provided R.S. a FAPE.  ALJ Op. at 60–61.  The Parent now complains that the ALJ's determination is unsound simply because the Parent's witnesses were similarly "qualified" as experts and relied on more "current" educational assessments.  ECF No. 18-1 at 37–44.  The Court reads the record quite differently.  Each side presented well qualified witnesses who contemporaneously assessed the child's educational, behavioral, and psychological needs. The ALJ, to be sure, credited the MCPS witnesses over the Parent's but also fully explained why.

The ALJ, for example, noted that unlike the school psychologist, Parker**,** the Parent's child psychologist, Dr. Rao had never observed R.S. in school; had only interviewed R.S. in her office; and never even read R.S.' IEPs.  ALJ Op. at 49.  9/10 Tr. 326–39.[4]  Likewise, the ALJ found that the Parent's education expert, Mounce, based her opinions on her limited  interaction with R.S.  ALJ Op. at 50–52.  Relatedly, the ALJ rejected Mounce's opinion that R.S. required instruction in a small, special education setting like Echelon precisely because R.S.' academic performance faltered at that school.  *Id.*; *see also* Tr. 191-192.  In contrast, the ALJ underscored that MCPS witnesses more reliably grounded their opinions in formal assessments, records review, and personal observations of R.S.  Tr. at p. 1016–21, 1124–26, 1128-30, 1256–61, 1274, 1281–82, 1336–38.  In short, the ALJ's decision to credit MCPS' witnesses over the Parent's was rational and well supported.

---

[4] Because of errors in transmission of the administrative record, the parties provided another copy of the September 10 hearing transcript which is paginated differs from the rest of the record.  When referring to pages in the supplement, the Court refers to "9/10 Tr."

As to the Parent's contention that MCPS' witnesses relied on "outdated" information, this argument is mystifying.  ECF No. 18-1 at 41.  The dispute before the ALJ involved R.S.' educational needs over *four academic years*.  For each year, MCPS presented witnesses who each could speak to R.S.' educational experience at different times, but all were essential to establish that MCPS could and did provide R.S. a FAPE.  Moreover, as to R.S.' performance at Echelon, MCPS witnesses Berkowitz, Parker, and Aswall observed R.S. at Echelon and also reviewed and incorporated into their opinions written records documenting R.S.' performance at the school.  *See* MCPS Exs. 23, 24; P. Ex. 28.  In this respect, MCPS' witnesses certainly supported their conclusions with "contemporary" evidence.

Lastly, the Parent faults the ALJ's for "completely fail[ing] to consider the testimony of the Parent's third expert," KTS Director of Lower and Middle School Programs, Dr. Nicole Abera.  ECF No. 18-1.  But the hearing record reflects exactly the opposite—that not only did the ALJ consider Dr. Abera's testimony, she questioned Dr. Abera at length about the suitability of the KTS program for R.S.  Tr. at p. 729–733.  The ALJ also permitted the Parent to recall Dr. Abera as a rebuttal witness.  ALJ Op. at 7 n.10.

The Parent, at bottom, seems to take issue with the ALJ having failed to mention Dr. Abera by name in the ALJ's opinion.  But that criticism is misplaced.  The ALJ focused first, as she must, on whether MCPS provided a FAPE based on the entirety of the record.  Dr. Abera's description of the academic program at KTS would not feature prominently in that analysis.  Thus, the Court rejects the Parent's argument as unsupported by the record.

In sum, the Court concludes that the ALJ's factual findings were regularly made, and her credibility determinations were sound and well-reasoned.  The findings of fact will be accorded the deference owed pursuant to the IDEA.  The Court next turns to the Parent's legal challenges.

### D.      FAPE at MCPS

The Parent contends that the ALJ erred in concluding that R.S. had made sufficient "progress" at Fields Road to support that R.S. received a FAPE.  ECF No. 18-1 at 29–37.  To begin, the ALJ correctly summarized the law.  In *Endrew F.*, the United States Supreme Court made clear that FAPE requires that an IEP be "specifically designed" to meet the child's "unique needs" so as to "enable the child to make progress."  ALJ Op. at 58 (quoting *Endrew F.*, 137 S. Ct. at 998–99).  A student's *de minimis* advancements, by contrast, will not be considered "progress" under the IDEA sufficient to conclude that the school provided the student a FAPE. *Endrew F.,* 137 S. Ct. at 1000.

The ALJ next pointed to ample record evidence that MCPS' IEPs were designed such that R.S. made "progress."  As the ALJ correctly noted, R.S. had reached the IEP goals in reading and math goals for her kindergarten year and her reading goals for first grade by the spring semester.  MCPS Exs. 9 at 75 (noting that R.S. had met her reading goal in March 2017); 30 at 3–4.  *See also* MCPS Exs. 2 at 9–11; 31.  By the end of her first-grade year, R.S. had received a "Proficient" grade in nearly all subject areas while at Fields Road.  P. Exs. 5, 19; Tr. at p. 1035–36.  Accordingly, the record supports the ALJ's determination that R.S. made academic progress such that MCPS provided her a FAPE.  *See Endrew F.*, 137 S. Ct. at 1000 ("When a child is fully integrated in the regular classroom, as [IDEA] prefers, what that typically means is providing a level of instruction reasonably calculated to permit advancement through the general curriculum.").  This Court sees no reason to upset that determination.

As for R.S.' emotional and social progress, the ALJ credited evidence demonstrating that while at Fields Road, R.S. presented as a happy, personable, and affectionate child.  MCPS Ex. 2 at 13; Tr. at p. 1028.  Further, R.S. similarly appeared to engage with her peers at lunch, recess,

and "specials," such as art and physical education.  Tr. at p. 1026.  To be sure, R.S. struggled in this area.  P. Ex. 1A at 1–5.  But the record also reflects, and the ALJ credited, that MCPS teachers addressed R.S.' special needs through modifications such as indoor recess with a student of her choice to improve her socialization skills.  The March 2017 IEP also made special mention of using out-of-class reading intervention as an opportunity to work on small peer-group interaction.  MCPS Ex. 7 at 57.  Again, that the ALJ discounted the Parent's singular assessment that R.S. was "unhappy" at Fields Road after visiting Echelon does not undermine the well-founded conclusion that R.S. made progress socially and emotionally.  ALJ Op. at 47.  On this record, the Court accepts the ALJ's finding that R.S. made progress at MCPS and would have continued to do so if the proposed IEPs had been implemented, consistent with the teachings of *Endrew F*, and thus MCPS had given R.S. a FAPE.  *See MM*, 303 F.3d at 532–33; *A.B.*, 354 F.3d at 328 ("IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parent.").

In response, the Parent argues, for the first time, that the ALJ failed to consider R.S. "unique needs" such that MCPS did not offer R.S. a FAPE.  ECF No. 18-1 at 46–49 .  In the Parent's view, the IEPs were deficient in that they did not account for R.S. "potential for growth" and were not "appropriately ambitious."  *Id.* at 48 (quoting *Endrew F.*, 137 S. Ct. at 999–100).  The record belies this contention.  As the ALJ observed, the MCPS IEPs not only accurately described R.S.' strengths, the recommended programming sought to capitalize on those strengths.  ALJ Op. at 60–61.  MCPS also submitted evidence that it would employ strategies in the classroom setting to foster R.S.' leadership skills among her peers in the general education classroom.  *Id.*

In this respect, the Court cannot help but agree that MCPS' IEPs fundamentally sought to maximize RS' strengths by making access a general education curriculum available to her while accounting for her unique needs.  *See MM*, 303 F.3d at 526; 20 U.S.C. § 1412(a)(5).  This objective lies at the heart of providing FAPE in the least restrictive environment.  *See* MCPS Exs. 1–3, 7, 9, 17, 46; *Endrew F.*, 137 S. Ct at 999–1000 (noting that "for most children, a FAPE will involve integration in the regular classroom and individualized special education" and that IDEA "prefers" that children are "fully integrated in the regular classroom"); *see also Tice by and through Tice v. Botetourt Cnty. Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir. 1990).  The ALJ, therefore, did not err in concluding that R.S. received a FAPE in the MCPS system without resort to private school placement.[5]

## V.    Conclusion

In sum, the Court affirms the ALJ's determination.  The record adequately supports that MCPS provided R.S. a FAPE because it allowed her "to make progress in light of [her] circumstances" and account for her emotional needs.  *See Endrew F.*, 137 S. Ct. at 1001.  MCPS' IEPs were reasonably tailored to R.S.' particular challenges and provided adequate, individualized special education services while simultaneously offering R.S. an opportunity to learn and play with non-disabled students.  Thus, although the Parent rightly holds strong opinions as to what is best for her child, this Court must consider the totality of the record, which amply supports the ALJ's determination.

---

[5] Because the Court sees no basis to overturn the ALJ's decision that MCPS provided R.S. a FAPE, it similarly declines to address whether Echelon or KTS were "appropriate" alternative placements.  ALJ Op. at 64 (citing *M.S. ex rel. Simchick v. Fairfax. County Sch. Bd.*, 553 F.3d 315, 319 (4th Cir. 2009)).  That said, the Court is skeptical that either placement was appropriate for R.S.  R.S. appears not to have thrived at Echelon as evidenced by her progress reports, P. Exs. 29; 52, and the Parent's decision to pull her from the program.  And as for KTS, R.S. performed below grade-level in reading, writing, and math for her entire fourth grade year.  ECF No. 19-5 at 1.

The Parent's motions for summary judgment and for additional evidence (ECF Nos. 18, 19) are DENIED, and MCPS' motion is GRANTED (ECF No. 24).

A separate order follows.

| | |
|---|---|
| _____8/17/21_____ | _____/s/_____ |
| Date | Paula Xinis |
| | United States District Judge |